IN THE MATTER OF MEYER W. STEIN AND CHARLES R. TURNDORF, SOLICITORS OF THE COURT OF CHANCERY OF NEW JERSEY.

Argued November 22, 1948—Decided January 3, 1949.

*Mr. Peter J. McGinnis* argued the cause for Meyer W. Stein (*Messrs. Ward, McGinnis & Friedman,* attorneys).

*Mr. Herbert J. Hannoch* argued the cause for Charles R. Turndorf (*Messrs. Hannoch & Lasser,* attorneys).

*Mr. William W. Evans* prosecuted the rule under appointment of the Court.

PER CURIAM. Meyer W. Stein, an attorney at law and Charles R. Turndorf, an attorney and counsellor at law are before the

Bar of this Court on Rules to Show Cause why they should not be disbarred from practice as such attorneys and counsellor, or otherwise disciplined.

These rules came about by reason of the fact that former Chancellor Oliphant did, on September 8, 1948, suspend Mr. Stein from thereafter appearing in the Court of Chancery as a solicitor and prohibiting him from exercising any of the functions, rights and privileges of a solicitor pending further action of the Supreme Court, and did suspend Mr. Turndorf from appearing in the Court of Chancery as a solicitor and counsellor or exercising any of the functions, rights and privileges thereof for a period of six months. That order further provided that the matters and everything pertaining thereto be transmitted to the Supreme Court for such further disciplinary action as might be fit and proper.

On October 28, 1947, Stein, as solicitor for one Abe Yedwab, alleged to be living at 39 Carroll Street, Paterson, N. J. filed a petition in the former Court of Chancery seeking a divorce from his wife Miriam Yedwab, whose address was given as 10—15th Ave., East Paterson, N. J., on the ground of desertion. The petition was in the usual form. It set forth the birth of one child without stating its age. The affidavit of non-collusion was executed by petitioner. No answer was filed, the cause was referred to Advisory Master William A. Hegarty and it came on for hearing before him on January 8, 1948. Stein appeared for the petitioner, no one for the defendant.

A decree nisi was awarded petitioner but before it was signed the Chancellor received an anonymous letter dated January 12, 1948, charging that the divorce was a fraud upon the Court.

An investigation of the matter was immediately initiated by the Chancellor following which an order to show cause was issued, directed to Abe Yedwab, the petitioner, and two witnesses who had testified in his behalf before the Advisory Master as to why they should not be adjudged guilty of criminal contempt for making false and perjurious statements under oath. On the return of the rule they pleaded guilty and submitted affidavits in which they swore that the testimony they had given at the

divorce hearing was false and that they had been coached and told what to testify to by Stein. Abe Yedwab also charged in his affidavit that Turndorf, attorney of Mrs. Yedwab, the defendant, was a party to the arrangements leading to the divorce proceedings.

The Chancellor thereupon, on April 19, 1948, ordered that Stein and Turndorf show cause before Vice Chancellor Grimshaw why they should not be adjudged guilty of malpractice, intentional fraud and misconduct.

The matter came on for hearing and it resulted in the Vice Chancellor advising the Chancellor to make the order of suspension of September 8, 1948.

We are in accord with the findings expressed in the unreported opinion of the Vice Chancellor. We are convinced that Stein knowingly presented a fraudulent divorce case before the Advisory Master and that Turndorf failed to reveal to the Court his knowledge of the fraud about to be perpetrated.

The Yedwabs were married on August 16, 1942 and they lived together until he was inducted into the army in October, 1943. When he was discharged, in January, 1946, they went to live with her parents and on June 15th of that year purchased a home at 10—15th Avenue, East Paterson, where they lived together until October 26, 1947, when they separated. Mrs. Yedwab continued to live in the house; he went to live with his mother. A son had been born to them on November 3, 1946. While living together the Yedwabs had marital difficulties and she consulted Turndorf who sent for Mr. Yedwab and talked to him in regard to the matter.

After this conference Yedwab consulted A. Leon Kohlreiter, an attorney and friend, about a divorce. He was advised he could not procure one on the grounds of desertion because of the date of his child's birth and because he and his wife had lived together until October, 1947. He was told his only grounds would be extreme cruelty if it could be worked out, but that it would be very difficult. Kohlreiter informed Yedwab he would not handle the case but would refer him to Stein, who specialized in divorce matters. He fixed the fee to be charged

by Stein and it is inconceivable that he did not explain the true facts, as he knew them, to Stein.

There is no question but that Stein was a divorce "specialist". He has been practicing for twenty-eight years and in that time says he has filed approximately two thousand petitions for divorce. He probably did not file many during the time he was securing a foothold in the practice of the law and over the last fifteen or twenty years has seemingly averaged one hundred cases a year. He was more than a divorce "specialist", he was operating a divorce mill.

It was not strange with this background Yedwab was referred by Kohlreiter to Stein but what thereafter happened is most strange. At Yedwab's first conference with Stein in September, 1947 he was told he was not entitled to a divorce. Yedwab stated his wife had no objection thereto and suggested Stein contact Turndorf. This he did by telephone and then told Yedwab to move out of the East Paterson house. He did move in October, after which he went to Stein's office and signed the affidavit of non-collusion. At that first conference Stein made long hand notes of facts necessary for the drafting of the petition. The age of the child was an important factor yet that does not appear on those notes. In the divorce petition he simply said "One child was born of the marriage, to wit: David Yedwab". He excuses this on the ground that his stenographer neglected to insert it. But Stein had seen the child in his office previous to the filing of the petition. It was less than a year old. He was a father and a grandfather. A casual glance would have told him the child was not two or more. It is likewise strange that the notes made by Stein made no mention of the two years' desertion requirement of either of the parties and that they give the address of Mrs. Yedwab as 10–15th Avenue, East Paterson while at the divorce hearing Yedwab testified her address was 509–12th Avenue.

Stein testified that after he learned of the alleged fraud in the divorce proceedings he had an investigation made. This consisted merely of having a private detective go to 15th Avenue, East Paterson, and discovering that the Yedwabs had lived at No. 10 and were residing there in the fall of 1947.

Was this the action of an innocent man? Would not a lawyer, thinking himself perhaps involved in an alleged fraudulent divorce proceeding, have confronted his client and his witnesses who had testified and who he had interviewed, charged them with the fraud and demanded the truth from them? This should have been the conduct, as we perceive it, of one privileged to practice law in this State. True, Stein wrote a letter to the Advisory Master saying "I have discovered in this matter that the petitioner did not disclose certain true facts to the Court at the time of the hearing before Your Honor", facts he was cognizant of before the petition was filed. He suggested the Court look into the matter rather than he making a thorough investigation himself. This appears to us an effort to put the record straight for himself well knowing his own guilt.

The testimony of the petitioner, his brother Emanuel Yedwab and his friend Sol Schwartz, both of whom appeared as witnesses in his behalf at the hearing of the divorce cause before Advisory Master Hegarty, was false and perjurious. They were admitted liars in that instance, but should their testimony be utterly cast aside and Stein believed as to the dealings between him and those individuals? We think not. There are too many corroborating facts and circumstances.

Each of these men say Stein instructed them as to what to say at the divorce hearing, a fabrication of lies. When first consulted, having told the petitioner, according to him, that he had no case, he informed petitioner false dates and places of residence would have to be testified to, which be supplied, and that corroborating witnesses would have to be obtained. Emanuel Yedwab says that when he saw Stein before testifying he told him he had been in the army and knew nothing about the facts but that Stein said he had nothing to worry about and to forget all about it, meaning any difficulty which might result from the false swearing. Schwartz testified he was told what to say before the Advisory Master, he knowing such testimony would be false. Stein's denial of all this "coaching" does not ring true. There is other evidence, which need not be here recited, tending to corroborate the testimony given by these men and we are satisfied of Stein's guilt. He coun-

selled and conspired with them to cause rank perjury to be committed and a fraud perpetrated upon the Court. Perjury, in the course of trials, is all too rampant. When it is aided and abetted by a member of the bar stern measures must be taken. His unfitness as a lawyer has been amply demonstrated.

The case of Turndorf falls into a different category. He had been a friend of the Yedwabs for some years and was counsel for Mrs. Yedwab. His services to her related in the main to efforts looking toward a conciliation between the parties, to the disposition of an automobile, title to which was in dispute between them, title to the property on 15th Avenue, East Paterson, and continued payments of support to her by her husband. Numerous conferences were had. Turndorf claims he never knew of the divorce proceedings until Mrs. Yedwab was served. He advised her to defend the action but she refused. He then arranged a conference at Stein's office where title to the automobile and the real estate was settled and Yedwab agreed to continue payments of $20.00 per week to his wife. Peculiarly the deed to the real estate remained unrecorded, in Stein's possession, until after the divorce hearing. The transfer was probably contingent on the divorce decree.

Turndorf knew Yedwab had no legal grounds for divorce from his client. While he advised a defense to the action and she refused, thereafter he continued to represent her in other matters related thereto. His knowledge of the fraudulent divorce proceedings was admitted by him before the Vice Chancellor. He gave as his reason for not protesting to Stein or advising the Chancellor that a fraud was being perpetrated that what he knew was privileged and he had no right to disclose his knowledge or to protest. Turndorf's knowledge of the facts gleaned from Mrs. Yedwab was not privileged under the circumstances of this case. She permitted and assented to his discussing her marital and other difficulties with numerous other people, including Stein, and in their presence Turndorf advised her to defend the divorce action. He had personal knowledge of the facts, in addition to any information he received from his client.

To bring a matter within the rule of "privilege" there must be both professional employment and professional confidence. A lawyer cannot be properly consulted professionally for advice to aid in the perpetration of a fraud on a court. The claim of "privilege" is that of the client and a fraudulent object or purpose puts him beyond the pale of the Law's protection. *Matthews v. Hoagland*, 48 *N. J. Eq.* 455 *(Ch.* 1891*)*.

Numerous canons of Professional Ethics of the American Bar Association were violated by Turndorf. In canon 15 it is set forth "The office of attorney does not permit, much less does it demand of him for any client, violation of law or any manner of fraud or chicane. He must obey his own conscience and not that of his client". In violation of canon 16 he continued to represent Mrs. Yedwab after he knew of the fraud being perpetrated. The applicable portion of canon 29 which was violated by Turndorf reads as follows: "Lawyers should expose without fear or favor before the proper tribunals corrupt or dishonest conduct in the profession".

Where there is revelation of a fraud about to be perpetrated upon a Court, of which an attorney is an officer, there is a definite obligation upon and we conceive it to be the duty of that attorney to communicate and make a full disclosure of such to the Court, when the matter is not privileged. Counsel for Turndorf urges in his behalf *Opinion* 268 *of the Committee on Professional Ethics and Grievances of the American Bar Association (1947 Ed. p.* 566*)* but it is not pertinent here as it deals with the question of "privilege". Even in that opinion it was said that "ordinarily it is the duty of a lawyer, as an officer of the Court, to disclose to the Court any fraud he believes is being practiced on the Court". This statement was qualified by saying such duty does not transcend that to preserve the client's confidence. Even if that opinion was applicable to the instant case it would not be controlling. This Court reserves to itself the right to be the final arbiter of the professional conduct of the members of the bar of this State.

There was apparently grave doubt in Turndorf's mind as to whether or not he should disclose the fraud. His conscience bothered him and we are convinced he caused to be written the

anonymous letter to the Chancellor. While this is denied by Turndorf it was admittedly written on his stationery and on his office typewriter. It was couched in legalistic language. While the evidence shows he did not himself write it on the machine, he, without doubt, instigated it. How much better it would have been if he had openly and frankly made the disclosure to the Court.

Whether or not Turndorf should have openly made the disclosure may not have seemed to him clear and unequivocal, it is possible he acted in accordance with his duty, as he saw it. While his failure to do so was a dereliction of duty we are willing to give him the benefit of the doubt. He should be reprimanded for his conduct but in view of all of the circumstances we reach the conclusion he has suffered enough. Let it serve as a warning to him and other members of the bar and guide them in their future conduct. This opinion, to be published in the official reports, will serve as that reprimand.

Stein deserves no sympathy. The evidence shows him guilty, as found by the Chancellor, and of moral turpitude. One of the grounds for disbarment in this State is "Such intentional fraud upon the Court or a client as shows evidence of moral turpitude", *In re Cahill*, 66 *N. J. L.* 527 *(Sup. Ct.* 1901); *In re Ries*, 131 *N. J. L.* 559 *(Sup. Ct.* 1944). He showed an utter disregard of his oath as an attorney. The streams of justice must be kept clear and pure. The courts and the public are entitled to the highest standard of conduct on the part of the members of the bar. One of the first concerns of this Court is to see that standard maintained. As was aptly said *in Re Cahill, supra,* "The court must feel that it can rely implicitly upon the representations and recitals of fact by its attorneys and solicitors. If a solicitor allows a petition for divorce to be presented to the court, with an affidavit of non-collusion which he knows to be false, he participates in an attempt to deceive the court. Such conduct in an officer of the court is highly reprehensible. The court has the right to rely upon the integrity of its officers. The legal profession is a confidential one, with a double duty upon its members, viz., utmost good faith toward both client and court. A lawyer who

seeks by trick or by deception to impose upon either his client or the court is unfitted to advise the one or to appear before the other. He desecrates the temple of justice".

It is unfortunate that the career of an attorney, after twenty-eight years of practice, must come to an end, but Stein's conduct demands it. The order is that the name of Meyer W. Stein be stricken from the rolls.

On the return of the rules to show cause there was also heard the appeals of Stein and Turndorf from the final orders or decrees made by the Chancellor. We have considered the whole record and the appeals are moot, in view of our disciplinary action, and are without merit. In regard to the Turndorf appeal we conclude the Chancellor exceeded his authority in suspending him from practice as a solicitor for a period of six months. *In re Hahn,* 85 *N. J. Eq.* 510 *(E. & A. 1915).* That question is likewise moot inasmuch as the Chancellor's order could have run and had effect only until September 15, 1948 when the Judicial Article of the Constitution of 1947 took effect and the former Court of Chancery passed out of existence. The appeals are dismissed.

No. A–46.

*For dismissal:* Chief Justice VANDERBILT and Justices CASE, HEHER, WACHENFELD, BURLING, and ACKERSON—6.

*Opposed:* None.

No. D—2.

*For disbarment:* Chief Justice VANDERBILT and Justices CASE, HEHER, OLIPHANT, WACHENFELD, BURLING, and ACKERSON—7.

*Opposed:* None.

No. D—3.

*For reprimand:* Chief Justice VANDERBILT and Justices CASE, HEHER, OLIPHANT, WACHENFELD, BURLING, and ACKERSON—7.

*Opposed:* None.