721 A.2d 733 (1998)
Thomas CORSIE and Lynn Corsie, Plaintiffs-Appellants,
v.
Michael CAMPANALONGA, Individually and/or as agent and/or employee of St. Anthony's Roman Catholic Church, Defendant, and
James F. Johnson, Individually and/or as agent and/or employee of St. Anthony's Roman Catholic Church, St. Anthony's Roman Catholic Church, and Archdiocese of Newark, Defendants-Respondents.
Michael J. CORSIE, Plaintiff,
v.
Michael CAMPANALONGA, Archbishop Thomas Boland, Monsignor James F. Johnson, and the Archdiocese of Newark, Defendants.
Superior Court of New Jersey, Appellate Division.
Submitted October 5, 1998.
Decided November 17, 1998.
*734 Michael J. Geron, Springfield, for plaintiffs-appellants (Mr. Geron, of counsel and on the brief).
McElroy, Deutsch & Mulvaney, Morristown, for defendants-respondents (James P. Lisovicz, of counsel; Timothy P. Smith, on the brief).
Before Judges HAVEY, PAUL G. LEVY and LESEMANN.
The opinion of the court was delivered by HAVEY, P.J.A.D.
By leave granted, plaintiffs appeal from an order entered in the Law Division denying their demand for the production of documents contained in the personnel files of defendant Michael Campanalongo, a former Catholic priest, in the possession of defendant Archdiocese of Newark.
These consolidated actions involve the claimed sexual molestation of plaintiffs Thomas Corsie and Michael Corsie, brothers, by Campanalongo. The alleged incidents are claimed to have occurred during the years 1967 through 1969. At the time, Campanalongo was assigned to St. Anthony's Roman Catholic Church (St.Anthony's) in Northvale. St. Anthony's is within the jurisdiction of the Archdiocese of Newark. Plaintiffs' complaint alleges that Campanalongo[1] sexually molested and assaulted them during the pertinent time period, and that defendants St. Anthony's, Monsignor James Johnson, Archbishop Thomas Boland, and the Archdiocese failed to protect plaintiffs from being harmed by Campanalongo. Specifically, against the church defendants, plaintiffs allege negligent supervision, failure to establish reasonable guidelines in the selection of priests, negligent entrustment and fraud.
Plaintiff Michael Corsie moved to take the oral deposition of Monsignor Johnson, Monsignor Paul Bootkoski, the current Vicar for Priests, the Custodian of Records for the Archdiocese, and all persons who served as Vicar for Priests for the Archdiocese since 1965. Plaintiffs also requested that the church defendants produce all documents *735 contained in the file of the Vicar for Priests, and other files relating to Campanalongo, all files regarding sexual misconduct by any priest from 1960 to present, and any documents regarding any law suit arising from sexual misconduct.
Defendants moved for a protective order precluding the depositions and disclosure of the documents demanded. They raised several privileges, including the cleric-penitent privilege, and the Free Exercise Clause of the First Amendment, which defendants argued protected internal communications of a religious organization from disclosure.
Plaintiffs moved for the production of the documents in question and, in the alternative, for an in camera review by the Law Division judge of the documents claimed to be privileged by defendants. In response, the church defendants produced the certification of Bishop Bootkoski, the current Vicar for Priests, and a "privilege log" consisting of correspondence and documents in the files of the church and Archdiocese dated from 1962 through 1996. In his certification, Bishop Bootkoski explained that there are approximately 750 individual files "that comprise the universe of files that I maintain as the Vicar for Priests," that there are "twelve files in which a sexual impropriety of any nature whatsoever on the part of any priest has been alleged," and that "[t]here is no allegation of any sexual impropriety of any nature by any priest in any of above files that was received earlier [than] the mid 1980's." He also stated that "[t]here are no documents in my file relating to [Campanalongo] dated from July 1965 to February 1973." Bishop Bootkoski produced for his counsel the twelve files concerning alleged sexual misconduct.
In his certification, Bishop Bootkoski also explained his function as the Vicar for Priests. He asserted that the Vicar files "are of a confidential nature of the highest order," because:
The Vicar for Priests serves as a confidant to priests in need. Accordingly, priests who confide in the Vicar for Priests do so with an expectation of privacy and confidentiality. The relationship is the same as a confessional matter with any other penitent. Through the Vicar for Priests, priests in distress seek counsel and support regarding matters related to the stresses and tension involved in Ministry.
Bishop Bootkoski certified that he cannot produce the privileged documents held in his role as Vicar to anyone other than another Vicar because:
such a production would completely undermine the function of the Vicar for Priests for all present and future priests as they could never rely on the confidentiality of their consultations with the Vicar.
The church defendants also submitted the certification of Sister Thomas Mary Salerno, Custodian of the Records for the Archdiocese. Sister Salerno identified three files pertaining to Campanalongo: an assignment file, the file maintained by the Vicar for Priests, and a personnel file. She states that since 1973, there are no materials in the file pertaining to Campanalongo.
On appeal, plaintiffs seek "production of documents relative to [Campanalongo] only.... [The plaintiffs'] request goes only to the parties to this action and not to any arguably innocent third parties." We assume from this stipulation that plaintiffs do not seek disclosure of documents pertinent to other priests. We therefore limit our discussion respecting application of the pertinent privileges as they pertain to information in the church defendants' files relating to Campanalongo.
The first issue is whether any correspondence or any communications in the files of the Vicar for Priests is protected by the "cleric-penitent" privilege. The cleric-penitent privilege is codified at N.J.S.A. 2A:84A-23,[2] which provides:
Any communication made in confidence to a cleric in the cleric's professional character, or as a spiritual advisor in the course of the discipline or practice of the religious body to which the cleric belongs or of the religion which the cleric professes, shall be privileged. Privileged communications *736 shall include confessions and other communications made in confidence between and among the cleric and individuals, couples, families or groups in the exercise of the cleric's professional or spiritual counseling role.
As used in this section, "cleric" means a priest, rabbi, minister or other person or practitioner authorized to perform similar functions of any religion.
The privilege accorded to communications under this rule shall belong to both the cleric and the person or persons making the communication and shall be subject to waiver only under the following circumstances:
(1) both the person or persons making the communication and the cleric consent to the waiver of the privilege; or
(2) the privileged communication pertains to a future criminal act, in which case, the cleric alone may, but is not required to, waive the privilege.
The codified privilege was revised by the Legislature in response to a narrow interpretation given the privilege in State v. Szemple, 135 N.J. 406, 640 A.2d 817 (1994). Szemple held that the statute conferred a testimonial privilege only on clergypersons, and that the clergypersons "alone may elect to waive the privilege in their sole discretion and within the dictates of their religious beliefs." Id. at 422-23, 640 A.2d 817. Thus, the penitent need not consent to the disclosure of a confession. Id. at 423, 640 A.2d 817. In 1994, the Legislature revised the privilege "with unmistakable clarity to confer on both the cleric and on the party who made the communication the power to prevent its disclosure." Biunno, Current N.J. Rules of Evidence, comment 3 to N.J.R.E. 511 (1998-99). "Both the cleric and the penitent are now holders of the privilege." Ibid.
We are satisfied that the communications in the Vicar's files "made [by Campanalongo] in confidence" to the Vicar are protected by the privilege. N.J.S.A. 2A:84A-23. It is undisputed that the Vicar was acting in his "professional character, or as a spiritual adviser" when, or if, Campanalongo confided in him respecting the alleged sexual assaults or any other personal or professional matter. Ibid. According to Bishop Bootkoski, the Vicar's files "are of a confidential nature of the highest order." Priests confide in the Vicar with the expectation of privacy and confidentiality; the relationship is the same as a confessional matter with any other penitent. Priests in distress seek counsel and support regarding matters related to the stresses and tensions involved in their ministry. Thus, according to Bishop Bootkoski, he received such communications in confidence as a "confidant to priests in need." Thus, so long as Campanalongo's communications to the Vicar were "confessions" or otherwise made with the expectation of confidentiality, these communications are protected against disclosure. Ibid. See also State v. List, 270 N.J.Super. 169, 175, 636 A.2d 1054 (App.Div.1993) (holding that defendant's letter left at the cleric's residence "for anyone to find and read, cannot be considered to have been made with a reasonable expectation of confidentiality").
We agree with plaintiffs, however, that every document contained in the Vicar's files is not necessarily privileged. Regrettably, the motion judge did not inspect in camera the documents contained in the Vicar's files, despite the fact that the church defendants had no objection to such an inspection. There is abundant authority for the proposition that in camera review of claimed confidential material is an approved and essential step when a privilege is invoked. See Atlantic City Convention Ctr. Auth. v. South Jersey Publ'g Co., Inc., 135 N.J. 53, 66-70, 637 A.2d 1261 (1994); Loigman v. Kimmelman, 102 N.J. 98, 112-13, 505 A.2d 958 (1986); Trump's Castle Assocs. v. Tallone, 275 N.J.Super. 159, 163-64, 645 A.2d 1207 (App.Div.1994); In re Environmental Ins. Declaratory Judgment Actions, 259 N.J.Super. 308, 318, 612 A.2d 1338 (App. Div.1992). Had an in camera inspection of the Vicar's files been undertaken here, the judge could have made a determination as to which documents were "communications made in confidence" and which were not. Without such an inspection, application of the privilege remains unsettled.
Plaintiffs also sought other documents relating to Campanalongo in the Archdiocese's *737 possession unrelated to the Vicar's files. The Law Division ruled that these files are "protected under the constitutional protections set forth in our cases."
The Establishment and Free Exercise Clauses of the First Amendment prohibit excessive government entanglement with religious organizations. The First Amendment "forbids civil courts from deciding issues of religious doctrine or ecclesiastical polity." Elmora Hebrew Ctr., Inc. v. Fishman, 125 N.J. 404, 413, 593 A.2d 725 (1991). "New Jersey cases have long held that civil courts lack jurisdiction over spiritual matters and the administration of church affairs that do not affect the civil or property rights of individuals." Chavis v. Rowe, 93 N.J. 103, 109, 459 A.2d 674 (1983).
"A court may not inquire into the validity of a religious belief or practice that prompts the challenged conduct[,]" F.G. v. MacDonell, 150 N.J. 550, 559, 696 A.2d 697 (1997), but "[a] party challenging state action as violative of free-exercise rights must establish that the action produced a coercive effect on the practice of religion." Ibid. (emphasis added). Further, "[t]he conduct at issue must have been part of the beliefs and practices of the defendant's religion." Ibid. (emphasis added). A court "may apply neutral principles of law to decide an issue that does not implicate religious doctrine." Ibid.
Our Supreme Court has held that the First Amendment does not protect a member of the clergy from actions arising out of sexual misconduct that occur during a time when a clergy member is providing counseling to a parishioner. F.G., supra, 150 N.J. at 561, 696 A.2d 697. If the First Amendment does not shield the clergy from state action involving alleged sexual misconduct, it follows that it does not protect against application of judicial discovery rules to uncover relevant material in personnel files related to that alleged sexual misconduct.
Moreover, the maintenance of personnel files, generally speaking, is nothing more than a normal administrative procedure of any organization, whether it be religious or secular. It can hardly be argued that the ordinary maintenance of such files is a practice which is "rooted in religious belief." Wisconsin v. Yoder, 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15, 25 (1972). Maintenance of the files does not involve religious doctrine. Discovery would not impinge upon the administration of the church or its customs or its practices. See Chavis, supra, 93 N.J. 103, 459 A.2d 674. There is no usurpation of the decision-making function of a religious organization. Simply put, there is no religious dispute involved in the production of personnel files in the discovery phase of trial. Thus, there is no occasion for the church defendants to claim a privilege of nondisclosure under the First Amendment.
We remand with direction that the motion judge examine the documents contained in the privilege log, particularly the Vicar's files, to determine whether any of the documents are protected by the cleric-penitent privilege. The judge, of course, may not only bar documents that are subject to the privilege, but may redact parts of the documents to avoid exposure of the identity of others who may have been involved in sexual episodes prior to, or subsequent to, the time period pertinent here. See Payton v. New Jersey Turnpike Auth., 148 N.J. 524, 550, 691 A.2d 321 (1997).
Plaintiffs, of course, must demonstrate that the documents being sought are "relevant to the subject matter involved in the pending action.... It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence...." R. 4:10-2(a); Connolly v. Burger King Corp., 306 N.J.Super. 344, 348, 703 A.2d 941 (App. Div.1997). Consequently, even documents not covered by the privilege may not be discoverable. The trial judge should consider these documents to determine relevance in the context of the discovery rules, bearing in mind the nature of the claims asserted by plaintiffs against the church defendants.
Reversed and remanded for further proceedings consistent with this opinion.
NOTES
[1] A default judgment has been entered against Campanalongo.
[2] See also N.J.R.E. 511.